UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
                    :

UNITED STATES OF AMERICA
                    :    **INDICTMENT**

     -v.-
                    :    **14 CRIM 240**

BENITO CHINEA and
JOSEPH DEMENESES,
                    :

        Defendants.  :

- - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy To Violate the Foreign Corrupt Practices Act and To Violate the Travel Act)

The Grand Jury charges:

### Relevant Statutory Background

1. The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, et seq. (the "FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: APR 1 0 2014



2.    The Travel Act, Title 18, United States Code, Section 1952, was enacted by Congress for the purpose of, among other things, making it unlawful for persons and businesses to travel in interstate or foreign commerce or use the mail or any facility in interstate commerce to promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on of certain unlawful activity, including violations of the Foreign Corrupt Practices Act and state anti-bribery laws.

## Relevant Entities and Individuals

3.    At all relevant times, the "Broker-Dealer" was a brokerage firm registered with the U.S. Securities and Exchange Commission (the "SEC"), with its principal place of business in New York, New York.  The Broker-Dealer maintained desks at the New York and American Stock Exchanges and had offices in New York, New York, and Miami, Florida.  The Broker-Dealer was a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).  Among other financial services, the Broker-Dealer provided fixed income trading services for institutional clients in the purchase and sale of foreign sovereign debt.  These services were provided within the Broker-Dealer by its "Global Markets Group" ("GMG")

on a commission basis in the following way.  Upon receiving an
order from a customer for a particular bond it wished to
purchase, the GMG would locate and purchase the bond and then
resell it to the customer at a higher price and keep the "mark-
up."  Conversely, when selling a bond for a customer, the GMG
would purchase the bond from the customer at a below-market
price and then sell that bond on the market for a higher price,
retaining the "mark-down."

       4.   At all relevant times, BENITO CHINEA, the
defendant, was the Chief Executive Officer of the Broker-Dealer
and worked at the headquarters of the Broker-Dealer in New York,
New York.  CHINEA was a United States citizen and therefore was
a "domestic concern," and an officer, employee and agent of a
"domestic concern," as that term is defined in the FCPA, Title
15, United States Code, Section 78dd-2(h)(1)(A) and (B).

       5.   At all relevant times, JOSEPH DEMENESES, the
defendant, was an officer and employee of the Broker-Dealer and
worked at the headquarters of the Broker-Dealer in New York, New
York.  DEMENESES served as a Managing Director in the Global
Markets Group of the Broker-Dealer.  DEMENESES was a United
States citizen and therefore was a "domestic concern," and an
officer, employee and agent of a "domestic concern," as that

term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A) and (B).

6.   At all relevant times, Ernesto Lujan (hereinafter, "Ernesto Lujan" or "Lujan") was an employee of the Broker-Dealer and was based in Miami, Florida.  Lujan served as a Managing Director in the GMG.  As such, Lujan was in charge of the Broker-Dealer's Miami office.  Lujan was a United States citizen and therefore was a "domestic concern," and an employee and agent of a "domestic concern," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A) and (B).

7.   At all relevant times, Tomas Alberto Clarke Bethancourt (hereinafter, "Tomas Clarke" or "Clarke"), was an employee of the Broker-Dealer and was based in Miami, Florida. Clarke served as a Senior Vice President in the GMG of the Broker-Dealer.  Clarke was a United States citizen and therefore was a "domestic concern" and an employee and agent of a "domestic concern," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A) and (B).

8.   At all relevant times, Jose Alejandro Hurtado (hereinafter, "Alejandro Hurtado" or "Hurtado"), was an associate or an employee of the Broker-Dealer and was based in

-4-

Miami, Florida.  Hurtado was a United States citizen and
therefore was a "domestic concern," and an employee and agent of
a "domestic concern," as that term is defined in the FCPA, Title
15, United States Code, Section 78dd-2(h)(1)(A) and (B).

9.   At all relevant times, Banco de Desarrollo
Económico y Social de Venezuela (hereinafter, "BANDES") was a
state-owned and state-controlled economic development bank of
the Bolivarian Republic of Venezuela.  It operated under the
direction of the Venezuelan People's Ministry of Planning and
Finance.  BANDES acted as the financial agent of the Venezuelan
government in order to promote economic and social development,
serve as the trustee for agencies of the public sector, and
support the expansion and diversification of Venezuela's
infrastructure.  BANDES was an "agency" and "instrumentality" of
a foreign government, as those terms are used in the FCPA, Title
15, United States Code, Section 78dd-2(h)(2).

10.   At all relevant times, Maria de los Angeles
Gonzalez de Hernandez (hereinafter, "Maria Gonzalez" or
"Gonzalez") served as either the Vice President of Finance or
the Executive Manager of Finance and Funds Administration of
BANDES.  In these capacities, Gonzalez oversaw BANDES's trading
abroad, including trading by the Broker-Dealer on behalf of

-5-

BANDES.  Gonzalez was listed by the Broker-Dealer as an authorized trading contact for BANDES.  Gonzalez was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

### Overview of the Bribery Scheme

11.   From at least in or around late 2008 through in or around 2012, BENITO CHINEA, JOSEPH DEMENESES, the defendants, and others known and unknown, including Lujan, Clarke, and Hurtado, participated in a bribery scheme in which CHINEA, DEMENESES, and other employees and agents of the Broker-Dealer made, and caused to be made, bribe payments to Gonzalez in exchange for Gonzalez's directing BANDES business to the Broker-Dealer and authorizing BANDES to execute bond trades with the Broker-Dealer.

12.   As a result of this scheme, Maria Gonzalez directed substantial BANDES business to the Broker-Dealer that generated tens of millions of dollars in revenue for the Broker-Dealer, of which millions of dollars -- representing a portion of the revenue generated by the Broker-Dealer's bond trading for BANDES -- were kicked back to Gonzalez by BENITO CHINEA, JOSEPH DEMENESES, the defendants, and others.

13.  In addition, certain co-conspirators regularly misrepresented to Gonzalez the amount of the mark-ups and mark-downs charged on the Broker-Dealer's trades for BANDES so that BENITO CHINEA, JOSEPH DEMENESES, the defendants, and others could profit more themselves by paying Gonzalez less than the portion they had initially agreed to pay her.  To keep track of the division of the commissions between Gonzalez and members of the conspiracy, co-conspirators periodically circulated spreadsheets and other documents that detailed the amounts of the commissions generated by BANDES trading and the division of the commissions among Gonzalez and members of the conspiracy.

14.  Because BENITO CHINEA, JOSEPH DEMENESES, the defendants, and their co-conspirators understood that the kickbacks paid to Gonzalez were unlawful, they and others devised methods to carry out and conceal this scheme from regulators and other authorities.  Specifically, CHINEA, DEMENESES, and other co-conspirators caused the Broker-Dealer to route funds from the United States to foreign bank accounts in Switzerland and elsewhere.  Portions of these funds were then further routed to accounts controlled by Gonzalez.  CHINEA, DEMENESES, and others used intermediaries who purported to be

"foreign finders" to transfer these funds, as described further below.

### Beginning of the Bribery Scheme

15.  At all relevant times, Maria Gonzalez, in her official capacity at BANDES, was authorized to purchase and sell substantial numbers of bonds for BANDES's portfolio.

16.  In or about 2008, Alejandro Hurtado, a resident of Florida who was working in private banking, was introduced to Gonzalez as a potential private banking customer.  At a subsequent meeting, Gonzalez conveyed that she was seeking to buy bonds for BANDES in the United States.  Gonzalez and Hurtado agreed that, if she directed BANDES business to Hurtado, a portion of any resulting commissions would be kicked back to her.

17.  Hurtado proposed this opportunity to a friend, Tomas Clarke, who worked at the Broker-Dealer's GMG in Miami, Florida, and Hurtado thereafter obtained the agreement of the GMG to participate in the corrupt scheme.  Clarke and Ernesto Lujan, who supervised the GMG in Miami, subsequently entered into an agreement with BENITO CHINEA and JOSEPH DEMENESES, the defendants, to buy and sell bonds with Gonzalez at BANDES and to

share the profits from the scheme according to a particular plan.

18.   As set forth below, BENITO CHINEA and JOSEPH DEMENESES, the defendants, and others agreed to cause certain intermediary persons and entities to be designated as "foreign finders" or "foreign associates" of the Broker-Dealer in order to secretly route funds to Gonzalez disguised as finder's fees paid to these other persons and entities.  CHINEA, DEMENESES, and others did this in order to conceal the true nature of the payments and to avoid attracting scrutiny from regulators.

19.   In or about December 2008, the Broker-Dealer attempted to open an account at a domestic financial institution (the "U.S Bank") in order for the Broker-Dealer to execute the desired bond trades for BANDES.  In the course of attempting to open the account at the U.S. Bank, JOSEPH DEMENESES, the defendant, circulated to BENITO CHINEA, the defendant, Lujan, and others at the Broker-Dealer a draft email to be sent to the Anti-Money Laundering ("AML") Department of the U.S. Bank. DEMENESES stated in this email:  "Let me know what you guys think – take a look overnight and we can make any changes in the am before we send it."  The draft email to the AML Department included the following statements, among others:

-9-

     i.  "We have been doing Fixed income business with BANDES for over five years. . ."

    ii.  "BANDES acts as financial agent of the state, to address the financing of projects geared towards economic decentralization and stimulating private investment in depressed and low performing areas."

   iii.  "Our main contact person for the Fixed Income business is Maria de los Angeles Gonzalez Rada." The draft email also included a link to Gonzalez's biography on the BANDES website, www.bandes.gov.ve.

The website link contained a biography of Gonzalez that made clear that she was a Venezuelan government official.

20. On or about December 16, 2008, BENITO CHINEA, the defendant, responded to the email set forth in the preceding paragraph.  CHINEA stated in this email:  "Nice job guys lets [sic] hope this helps sways [sic] [the U.S. Bank]."

21. On or about that same date, December 16, 2008, JOSEPH DEMENESES, the defendant, sent the email to the AML Department of the U.S. Bank, copying, among others, BENITO CHINEA, the defendant, and Lujan.

22.   Although the email stated that BANDES had been a customer of the Broker-Dealer for over five years, in truth and in fact, and as BENITO CHINEA and JOSEPH DEMENESES, the defendants, well knew, the Broker-Dealer had just begun conducting business with BANDES.

### CHINEA and DEMENESES Use Third Parties
### To Launder the Bribe Payments

23.   Beginning in or around January 2009, BENITO CHINEA and JOSEPH DEMENESES, the defendants, and others at the Broker-Dealer agreed with Hurtado to designate Hurtado's future spouse (hereinafter, "Hurtado's Associate"), as a foreign finder of the Broker-Dealer, even though she was residing within the United States and could not be properly designated a foreign finder.  The purpose of this designation was so that Hurtado's Associate could, without attracting attention from regulators, be sent funds from the Broker-Dealer that were purportedly for directing BANDES business to the Broker-Dealer, but were in fact payments to Gonzalez and to Hurtado for their roles in the bribery scheme.

24.   Specifically, between approximately in or around April 2009 and through in or around August 2009, the Broker-Dealer paid to Hurtado's Associate approximately $8 million in

purported finder's fees.  Pursuant to the agreement with
Gonzalez, a portion of this $8 million was then routed by
Hurtado to accounts Gonzalez maintained in Switzerland.

25.  In or about the summer of 2009, members of the
conspiracy grew concerned that Hurtado's Associate would no
longer be a plausible foreign finder in the future in light of
her marriage to Hurtado.  Accordingly, members of the conspiracy
sought to establish a new mechanism for the Broker-Dealer to pay
bribes owed to Gonzalez, as well as to pay Hurtado for his role
in the scheme.

26.  In or around July or August 2009, to establish
such a mechanism, BENITO CHINEA and JOSEPH DEMENESES, the
defendants, along with others at the Broker-Dealer, decided to
make Hurtado an employee of the Broker-Dealer so that money owed
to Gonzalez and Hurtado could be paid to him as purported salary
and bonuses.  Because of the substantial sums due to him for his
role in the Gonzalez bribery scheme, Hurtado immediately became
one of the most highly-compensated employees at the Broker-
Dealer, receiving approximately $4,384,616 in salary and bonuses
in 2010, notwithstanding his lack of a broker's license.

27.    In order to establish an alternative mechanism to make bribery payments to Gonzalez, JOSEPH DEMENESES, the defendant, Lujan, and Clarke, with the knowledge of BENITO CHINEA, the defendant, began directing bribe payments to Gonzalez through a Panamanian company called ETC Investments SA, which was also referred to as "ETC Investment, Inc." and "ETC Investment SA" (hereinafter, "ETC").  ETC was controlled by Clarke, and its president (hereinafter, "the ETC President") was Clarke's relative.  ETC had already been designated as a foreign finder of the Broker-Dealer, and the Broker-Dealer also entered into a foreign associate agreement with the ETC President.

28.    In order to make the agreed-upon bribe payments to Gonzalez, the Broker-Dealer issued checks signed by BENITO CHINEA, the defendant, to the ETC President as purported foreign finder fees which were deposited into ETC accounts in Switzerland.  These funds, along with funds that had previously been deposited in ETC's Swiss account for JOSEPH DEMENESES, the defendant, and for Clarke, were also utilized to make bribe payments to Gonzalez.

29.    BENITO CHINEA and JOSEPH DEMENESES, the defendants, agreed to use Broker-Dealer funds to reimburse

DEMENESES and Clarke for the bribe payments they had made, and caused to be made, to Gonzalez in Switzerland.  In order to conceal the bribe reimbursements in the Broker-Dealer's books, CHINEA and DEMENESES agreed to prepare false documents indicating sham loans from the Broker-Dealer to a corporate entity affiliated with DEMENESES called "GMT" and to a corporate entity affiliated with Clarke called "A.I. Vertical LLC."

**CHINEA Attempts To Reverse a Decline in BANDES Business**

30.  As a result of the bribery scheme, BANDES quickly became the Broker-Dealer's most profitable customer.  As the relationship continued, however, Gonzalez became increasingly unhappy with members of the conspiracy about the untimeliness of the payments due her under her agreement, and she threatened to suspend BANDES business.

31.  In furtherance of the scheme, BENITO CHINEA, JOSEPH DEMENESES, the defendants, and Lujan periodically communicated with each other about bribe amounts owed to Gonzalez.  For instance, on or about July 31, 2011, and on or about August 1, 2011, CHINEA and DEMENESES exchanged emails in which they discussed various "Topics of Concerns," including, among other things, payments to Gonzalez.  It was stated in these emails that, with respect to amounts "Paid in Cash," "Mari

[Gonzalez] [is] asking for her funds.  Estimated to be $554,000."  The emails went on to say that "Tomas [Clarke] is ready to pay when given the go ahead" and "Joe [DEMENESES] has paid in $1,022,000."

32.  On or about January 31, 2012, BENITO CHINEA, the defendant, met with Alejandro Hurtado in New York City in an effort to revive the suffering relationship between the Broker-Dealer and BANDES.  At the end of their meeting, CHINEA and Hurtado together telephoned Maria Gonzalez on her Venezuelan cellphone.

33.  At various times in 2012, BENITO CHINEA, the defendant, made continued efforts to pursue additional business from BANDES by contacting Hurtado and visiting him in Florida.

### Statutory Allegations

34.  From at least in or around late 2008 through in or around 2012, in the Southern District of New York and elsewhere, BENITO CHINEA and JOSEPH DEMENESES, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, violations of the FCPA, Title 15, United States Code, Section

78dd-2, and violations of the Travel Act, Title 18, United

States Code, Section 1952(a)(3)(A).

### Objects of the Conspiracy

35.   It was a part and object of the conspiracy that

BENITO CHINEA and JOSEPH DEMENESES, the defendants, and others

known and unknown, being citizens, nationals, and residents of

the United States, and therefore "domestic concern[s]," as that

term is defined in the FCPA, and officers, directors, employees,

and agents of a "domestic concern," and acting on behalf of such

"domestic concern," willfully made use of the mails and means

and instrumentalities of interstate commerce corruptly in

furtherance of an offer, payment, promise to pay, and

authorization of the payment of money, and offer, gift, promise

to give, and authorization of the giving of anything of value to

a foreign official, and to a person, while knowing that the

money and thing of value would and had been offered, given, and

promised, directly or indirectly, to a foreign official, for

purposes of (a) influencing acts and decisions of such foreign

official in that foreign official's official capacity, (b)

inducing such foreign official to do and omit to do acts in

violation of the lawful duty of such foreign official, (c)

securing an improper advantage, and (d) inducing such foreign

-16-

official to use the foreign official's influence with a foreign government and agency and instrumentality thereof to affect and influence acts and decisions of such government and agency and instrumentality, in order to assist CHINEA, DEMENESES and others known and unknown in obtaining and retaining business for and with, and directing business to, any person, in violation of Title 15, United States Code, Section 78dd-2(a)(1).

36.   It was a further part and an object of the conspiracy that BENITO CHINEA and JOSEPH DEMENESES, the defendants, and others known and unknown, willfully and knowingly, would and did travel in interstate and foreign commerce and use the mail and facilities in interstate and foreign commerce, with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, namely, (a) violations of the anti-bribery provisions of the FCPA, Title 15, United States Code, Section 78dd-2, (b) commercial bribery, in violation of New York State Penal Law Section 180.00, and (c) commercial bribe receiving, in violation of New York State Penal Law Section 180.05; and thereafter would and did perform and attempt to perform acts to otherwise promote, manage, establish, carry on, and facilitate the promotion, management,

establishment, and carrying on, of such unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3)(A).

## Means and Methods of the Conspiracy

37. Among the means and methods by which BENITO CHINEA and JOSEPH DEMENESES, the defendants, and others known and unknown, would and did carry out the conspiracy were the following:

a.    CHINEA, DEMENESES, and others affiliated with the Broker-Dealer agreed to pay bribes to Gonzalez in exchange for Gonzalez directing BANDES trading business to the Broker-Dealer.

b.    CHINEA, DEMENESES, and others caused the Broker-Dealer to execute trades of various fixed income instruments for BANDES and generated substantial revenue for the Broker-Dealer by charging BANDES mark-ups and/or mark-downs on the market price for the instruments.

c.    CHINEA, DEMENESES, and others made bribe payments to Gonzalez, directly and indirectly, from the revenue generated by the Broker-Dealer's trading business with BANDES.

## Overt Acts

38.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or around January 2009, Lujan, Clarke, and Hurtado prepared a foreign finder agreement between the Broker-Dealer and Hurtado's Associate.

b.    On or about July 21, 2009, Hurtado, at the direction of Gonzalez, wired approximately $509,250 from an account in the United States held by Hurtado and Hurtado's Associate to a correspondent bank account in New York, New York, for further transfer to an account in Switzerland held in the name of an associate of Gonzalez.

c.    On or about July 30, 2009, CHINEA, DEMENESES, and others, caused the Broker-Dealer in New York to wire transfer approximately $4,157,119 to an account held by Hurtado's Associate.

d.    On or about August 23, 2009, after the Broker-Dealer received an inquiry from the compliance department of one of its clearing agents regarding the Broker-Dealer's

-19-

finders, DEMENESES sent an email from his Broker-Dealer email account to the personal email account of Lujan regarding the resumé of Hurtado's Associate.  In the email, DEMENESES wrote in regard to Hurtado's Associate:  "We will have to fix this up a bit . . . . Like include a line that she has extensive contacts in media in the Us [sic] and Latin America and that is where she might have met the people she introduced us to."

       e.   On or about August 24, 2009, Lujan responded to the email set forth in the preceding paragraph and asked DEMENESES: "Can you just add the info[?]"

       f.   On or about August 25, 2009, DEMENESES sent an email to CHINEA, copying Lujan, attaching a revised biography of Hurtado's Associate and a biography of the ETC President, and stating in the email:  "Let me know what you think."

       g.   On or about November 12, 2009, Hurtado caused a wire transfer of approximately $5,000,000 from accounts in the United States controlled by him and Hurtado's Associate to an account controlled by Hurtado in Switzerland (the "Hurtado Swiss Account").

       h.   On or about December 11, 2009, Hurtado caused approximately $1,424,867 to be transferred from the

Hurtado Swiss Account to an account in Switzerland controlled by Gonzalez.

i.   On or about March 29, 2010, Clarke sent an email to DEMENESES, copying Lujan, attaching a spreadsheet setting forth GMG "Payouts," including to "Economista," a reference to Gonzalez, and including entries for "ETC Investment" in the approximate amount of $3,219,701; "Alejandro Hurtado Bonds" in the approximate amount of $1,676,783; and "Economista" in the approximate amount of $5,260,467.

j.   On or about April 13, 2010, Clarke and others caused the wire transfer of approximately $883,488 from an ETC account in Switzerland to an account in Switzerland controlled by Gonzalez.

k.   On or about April 21, 2010, Clarke sent an email to DEMENESES, copying Lujan, attaching a spreadsheet setting forth GMG "Payouts," including to "Economista," a reference to Gonzalez, and including entries for "ETC Investment" in the approximate amount of $737,656; "Alejandro Hurtado Bonds" in the approximate amount of $668,339; and "Economista" in the approximate amount of $107,985.

-21-

l.    On or about May 4, 2010, CHINEA and
DEMENESES, and others caused the Broker-Dealer in New York, New
York, to issue a check, signed by CHINEA, for approximately
$2,500,000 to the ETC President.

m.    On or about May 6, 2010, Clarke and others
caused a wire transfer of approximately $700,000 from an ETC
account in Switzerland to an account in Switzerland controlled
by Gonzalez.

n.    On or about June 15, 2010, CHINEA and
DEMENESES, and others caused the Broker-Dealer in New York, New
York, to issue a check, signed by CHINEA, for approximately
$2,052,773 to the ETC President, which was later deposited into
an ETC account in Switzerland.

o.    On or about September 1, 2010, CHINEA and
DEMENESES, and others caused the Broker-Dealer in New York, New
York, to issue a check, signed by CHINEA, for approximately
$300,000 to the ETC President, which was later deposited into an
ETC account in Switzerland.

p.    On or about September 1, 2010, CHINEA and
DEMENESES, and others caused the Broker-Dealer in New York, New
York, to issue a check, signed by CHINEA, for approximately

-22-

$700,000 to the ETC President, which was later deposited into an
ETC account in Switzerland.

q.   On or about September 30, 2010, CHINEA,
DEMENESES, Lujan, Clarke, and Hurtado met with Gonzalez in the
offices of the Broker-Dealer in New York, New York, and
presented her with a gift.

r.   On or about October 15, 2010, CHINEA and
DEMENESES, and others caused the Broker-Dealer in New York, New
York, to issue a check, signed by a Broker Dealer senior
executive, for approximately $500,000 to the ETC President.

s.   On or about November 15, 2010, CHINEA sent
an email from a personal email account to the personal email
account of DEMENESES, which listed the September 8, 2010 check
and the October 15, 2010 check to the ETC President.

t.   On or about July 29, 2011, DEMENESES sent an
email from his personal email account to the personal email
account of Lujan, stating:  "I went over these subjects with
Ben," and further stating:  "Ben and I went through this list
this past week.  He asked that i [sic] send him a copy so that
we have a working copy on word."  This email included a list of
items under the label "Topics of Concerns - 7/20/11 - Touching

-23-

Base with Ben[.]"  The list included a section called "Capital

vs Obligations," and within that section, a subsection called

"Obligations against Firm Capital[.]" Under that subsection, the

document included the following:  "1. Paid in Cash – Mari

[Gonzalez] asking for her funds. Estimated to be $554,000.

Tomas [Clarke] is ready to pay when given the go ahead.  Joe

[DEMENESES] has paid in $1,022,000."  Under that line, the

document included the following: "Understanding is that on these

funds the following will apply.  a. They will be paid to the

companies GMT and AI Vertical.  With TAX PROTECTION passed up to

these amounts."

       u.   On or about August 1, 2011, CHINEA sent an

email with the subject line "Topics of Concerns (revised and re-

organized 7.31.11)" from his personal email account to the

personal email account of DEMENESES, stating:  "I copy pasted

your document into four buckets 1) Corporate Structure 2)

Business Development/ Planning 3) Debt Related 4) P&L Related.

Please review attachment so we can table the pain points. I

began discussions with the guys we have some concerns but I'm

confident we will work through them. I listed them below."

Among the topics listed by CHINEA in the email was:  "Mari

[Gonzalez], Uri [the ETC President], Alejo [Hurtado], 4thco
journals and final figures a/o June 2011."  The attached
document included a section called "Debt Related" and a
subsection called "Obligations against Firm Capital."  Under
that subsection, the document included the following:  "1. Paid
in Cash – Mari [Gonzalez] asking for her funds. Estimated to be
$554,000.  Tomas [Clarke] is ready to pay when given the go
ahead. Joe [DEMENESES] has paid in $1,022,000."  Under that
line, the document included the following:  "Understanding is
that on these funds the following will apply.  a. They will be
paid to the companies GMT and AI Vertical.  With TAX PROTECTION
passed up to these amounts."

       v.   On or about January 31, 2012, CHINEA met
with Hurtado at a restaurant in Brooklyn, New York to discuss
reviving the Broker-Dealer's BANDES trading business.

       w.   On or about January 31, 2012, CHINEA, while
driving with Hurtado in New York City, called Gonzalez's
Venezuelan cellphone number in an effort to revive the Broker-
Dealer's trading business with BANDES.

       x.   On or about May 31, 2012, CHINEA sent an
email to three Broker-Dealer employees stating: "Alejandro

-25-

[Hurtado] is telling me we will be starting up with Bandes in the next couple of weeks he is coming to town to discuss with us.  Truth is we have heard this story before, but in the event it happens can we trade for Bandes through [a particular clearing broker]?"

y.   In or about December 2012, CHINEA traveled to Florida to meet with Hurtado to discuss reviving the flow of business from BANDES to the Broker Dealer.

(Title 18, United States Code, Section 371.)

## COUNTS TWO - SIX

### (Violations of the Foreign Corrupt Practices Act)

The Grand Jury further charges:

39.   The allegations contained in paragraphs 3 through 33 and 37 through 38 are repeated and realleged as if fully set forth herein.

40.   On or about the dates set forth below, in the Southern District of New York and elsewhere, BENITO CHINEA and JOSEPH DEMENESES, the defendants, being citizens, nationals, and residents of the United States and therefore "domestic concern[s]," as that term is defined in the FCPA, and officers, directors, employees, and agents of a "domestic concern" acting

on behalf of such "domestic concern," willfully used and caused
to be used the mails and means and instrumentalities of
interstate commerce corruptly in furtherance of an offer,
payment, promise to pay, and authorization of the payment of any
money, and offer, gift, promise to give, and authorization of
the giving of anything of value to a foreign official, and to a
person, while knowing that the money and thing of value would be
and had been offered, given, and promised, directly or
indirectly, to a foreign official, for purposes of (a)
influencing acts and decisions of such foreign official in that
foreign official's official capacity, (b) inducing such foreign
official to do and omit to do acts in violation of the lawful
duty of such foreign official, (c) securing an improper
advantage, and (d) inducing such foreign official to use the
foreign official's influence with a foreign government and agency
and instrumentality thereof to affect and influence acts and
decisions of such government and agency and instrumentality, in
order to assist CHINEA and DEMENESES in obtaining and retaining
business for and with, and directing business to, any person; to
wit, in furtherance of offers, payments, promises to pay, and
authorizations of the payment of money to Gonzalez, a Venezuelan

-27-

foreign official, in order to obtain and retain trading business from BANDES, CHINEA and DEMENESES made use of, and caused the use of the following means and instrumentalities of interstate commerce:

| Count | Date | Use of Instrumentality of Interstate Commerce |
|-------|------|-----------------------------------------------|
| 2 | July 21, 2009 | A transfer of approximately $509,250 from a Hurtado/ Hurtado's Associate account in the United States through a correspondent account in New York, New York, to a Gonzalez associate's account in Switzerland. |
| 3 | July 30, 2009 | A wire transfer from the Broker-Dealer in New York, New York, of approximately $4,157,119 to a Hurtado's Associate account. |
| 4 | May 4, 2010 | Issuance and conveyance from the Broker-Dealer in New York, New York, of a check to the ETC President for approximately $2,500,000, which was later deposited into an ETC account in Switzerland. |
| 5 | June 15, 2010 | Issuance and conveyance from the Broker-Dealer in New York, New York, of a check to the ETC President for approximately $2,052,773, which was subsequently deposited into an ETC account in Switzerland. |
| 6 | July 29, 2011- August 1, 2011 | An exchange of emails from July 29, 2011, through August 1, 2011, among CHINEA, DEMENESES and Lujan discussing bribe amounts paid and owed to Gonzalez and other matters in furtherance of the bribe scheme. |

(Title 15, United States Code, Section 78dd-2(a)(1), and
Title 18, United States Code, Section 2.)

## COUNTS SEVEN - ELEVEN

### (Violations of the Travel Act)

The Grand Jury further charges:

41.  The allegations contained in paragraphs 3 through
33 and 37 through 38 are repeated and realleged as if fully set
forth herein.

42.  On or about the dates set forth below, in the
Southern District of New York and elsewhere, BENITO CHINEA and
JOSEPH DEMENESES, the defendants, willfully and knowingly,
traveled in interstate and foreign commerce and used the mail
and facilities in interstate and foreign commerce, with intent
to otherwise promote, manage, establish, carry on, and
facilitate the promotion, management, establishment, and
carrying on of unlawful activity, namely, (a) violations of the
anti-bribery provisions of the FCPA, Title 15, United States
Code, Section 78dd-2, (b) commercial bribery, in violation of
New York State Penal Law Section 180.00, and (c) commercial
bribe receiving, in violation of New York State Penal Law
Section 180.05; and thereafter performed and attempted to

-29-

perform acts to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on, of such unlawful activity, and aided and abetted the same, as follows:

| Count | Date | Use of Instrumentality of Interstate Commerce |
|-------|------|-----------------------------------------------|
| 7 | July 21, 2009 | A transfer of approximately $509,250 from a Hurtado/Hurtado's Associate account in the United States through a correspondent account in New York, New York, to a Gonzalez associate's account in Switzerland. |
| 8 | July 30, 2009 | A wire transfer from the Broker-Dealer in New York, New York, of approximately $4,157,119 to a Hurtado's Associate account. |
| 9 | May 4, 2010 | Issuance and conveyance from the Broker-Dealer in New York, New York, of a check for approximately $2,500,000 to the ETC President, which was later deposited into an ETC account in Switzerland. |
| 10 | June 15, 2010 | Issuance and conveyance from the Broker-Dealer in New York, New York, of a check to the ETC President for approximately $2,052,773, which was subsequently deposited into an ETC account in Switzerland. |
| 11 | July 29, 2011 - August 1, 2011 | An exchange of emails from July 29, 2011, through August 1, 2011, among CHINEA, DEMENESES and Lujan discussing bribe amounts paid and owed to Gonzalez and other matters in furtherance of the bribe scheme. |

(Title 18, United States Code, Sections 1952 and 2.)

## COUNT TWELVE

### (Conspiracy To Commit Money Laundering)

The Grand Jury further charges:

43.   The allegations contained in paragraphs 3 through 33 and 37 through 38 are repeated and realleged as if fully set forth herein.

44.   From at least in or around early 2009 through in or around 2012, in the Southern District of New York and elsewhere, BENITO CHINEA and JOSEPH DEMENESES, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Section 1956.

45.   It was a part and an object of said conspiracy that BENITO CHINEA and JOSEPH DEMENESES, the defendants, and others known and unknown, would and did transport, transmit and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United

States, with the intent to promote the carrying on of specified unlawful activity, that is, (1) violations of the FCPA, Title 15, United States Code, Section 78dd-2, and (2) violations of the Travel Act, Title 18, United States Code, Section 1952(a)(3)(A).

(Title 18, United States Code, Section 1956(h).)

## COUNTS THIRTEEN – FIFTEEN

### (Money Laundering)

The Grand Jury further charges:

46.   The allegations contained in paragraphs 3 through 33 and 37 through 38 are repeated and realleged as if fully set forth herein.

47.   On or about the dates set forth below, in the Southern District of New York and elsewhere, BENITO CHINEA and JOSEPH DEMENESES, the defendants, willfully and knowingly transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful

-32-

activity, that is, (1) violations of the FCPA, Title 15, United States Code, Section 78dd-2, and (2) violations of the Travel Act, Title 18, United States Code, Section 1952(a)(3)(A), and aided and abetted the same; as follows:

| Count | Date | Transfer |
|---|---|---|
| 13 | July 21, 2009 | A transfer of approximately $509,250 from a Hurtado/Hurtado's Associate account in the United States through correspondent account in New York, New York, to a Gonzalez associate's account in Switzerland. |
| 14 | May 4, 2010 | Issuance and conveyance from the Broker-Dealer in New York, New York, of a check to ETC President for approximately $2,500,000, which was subsequently deposited into an ETC account in Switzerland. |
| 15 | June 15, 2010 | Issuance and conveyance from the Broker-Dealer in New York, New York, of a check to ETC President for approximately $2,052,773, which was subsequently deposited into an ETC account in Switzerland. |

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2.)

## COUNT SIXTEEN

### (Conspiracy To Obstruct Justice)

The Grand Jury further charges:

-33-

36. The allegations contained in paragraphs 3 through 33 and 37 through 38 are repeated and realleged as if fully set forth herein.

37. In or around November 2010, pursuant to its regulatory responsibilities, the SEC commenced a periodic examination of the Broker-Dealer. From in or around November 2010 through in or around March 2011, the SEC's examination staff made several visits to the Broker-Dealer's offices in New York, New York, to conduct the examination.

38. In or around early 2011, after the SEC examination had begun, JOSEPH DEMENESES, the defendant, discussed with others involved in the scheme that the SEC was examining the Broker-Dealer's relationship with BANDES. DEMENESES and others agreed that they would take steps to conceal the true facts of the Broker-Dealer's relationship with BANDES, including deleting emails.

### Statutory Allegation

39. In or around early 2011, in the Southern District of New York and elsewhere, JOSEPH DEMENESES, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to

-34-

commit an offense against the United States, to wit, to obstruct justice.

## Object of the Conspiracy

40.    It was a part and an object of said conspiracy that JOSEPH DEMENESES, the defendant, and others known and unknown, willfully, knowingly, and corruptly would and did influence, obstruct, and impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, to wit, an SEC examination, in violation of Title 18, United States Code, Section 1505.

## Overt Act

41.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere:

a. In or around early 2011, JOSEPH DEMENESES, the defendant, at the Broker-Dealer's office in New York, New York, directed certain members of the bribery conspiracy to delete emails relating to the bribery scheme.

-35-

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH ELEVEN

42.  As the result of committing one or more of the offenses charged in Counts One through Eleven of this Indictment, BENITO CHINEA and JOSEPH DEMENESES, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of those offenses, and all property traceable to such property.

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS TWELVE THROUGH FIFTEEN

43.  As the result of committing one or more of the offenses charged in Counts Twelve through Fifteen of this Indictment, BENITO CHINEA and JOSEPH DEMENESES, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real and personal, involved in such offenses, and all property traceable to such property.

-36-

## <u>Substitute Asset Provision</u>

44. If any of the above-described forfeitable property in Paragraphs 42 and 43, as a result of any act or omission of the defendant,

       a.   cannot be located upon the exercise of due diligence;

       b.   has been transferred or sold to, or deposited with, a third person;

       c.   has been placed beyond the jurisdiction of the Court;

       d.   has been substantially diminished in value; or

       e.   has been commingled with other property which cannot be subdivided without difficulty;

-37-

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

     (Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461.)

_____
GRAND JURY FOREPERSON

_____
PREET BHARARA
United States Attorney

_____
JEFFREY H. KNOX
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

-38-

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

- v -

**BENITO CHINEA and**
**JOSEPH DEMENESES**

**Defendants.**

## INDICTMENT

14 Cr.

(Title 15, United States Code, Section 78dd-2; Title 18, United
States Code, Sections 2, 371, 1952, and 1956.)

PREET BHARARA
United States Attorney.

JEFFREY H. KNOX
Chief, Fraud Section, Criminal Division, Department of Justice.

**A TRUE BILL**

Foreperson.

4/10/14  Filed indictment under seal  file ordered

AJ Peck limi